UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| ALPINE PCS, INC.<br>114 North Court Avenue<br>Suite 203<br>Gaylord, Michigan  49735<br><br>                    Plaintiff,<br><br>        vs.<br><br>FEDERAL COMMUNICATIONS<br>COMMISSION<br>445 12th Street, SW<br>Washington, District of Columbia  20544<br><br>and<br><br>PIONEER CREDIT RECOVERY, INC.<br>c/o Agent for Service of Process<br>CT CORPORATION SYSTEM<br>111 Eighth Avenue<br>New York, New York  19911<br><br><br>                    Defendants. | CASE NO.<br><br><br><br><br><br>**COMPLAINT** |

For its Complaint, Plaintiff Alpine PCS, Inc. ("Alpine") states as follows:

1.      Alpine is a Michigan corporation with its principal place of business in Gaylord,

Michigan.

2.     Defendant Federal Communications Commission ("FCC") is an agency of the United States of America which acted at all times pertinent hereto as a commercial actor and counterparty to various contractual agreements with Alpine.

3.     Defendant Pioneer Credit Recovery, Inc. ("Pioneer"), is, on information and belief, a Delaware corporation with its principal place of business in New York.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this suit pursuant to 28 USC § 1332 because the matters in controversy exceed the sum of $75,000, the parties are citizens of different states, and FCC has explicitly waived any immunity to suit it otherwise would have to the jurisdiction of this Court and is being sued as a private commercial actor, not in its capacity as an agency of the United States.

5.     To the extent that FCC's waiver of its immunity to suit in this Court is not effective, this Court has subject matter jurisdiction pursuant to 28 USC § 1346(b)(1) over this civil action which is based on claims against FCC for money damages caused by the wrongful act of persons employed by FCC while acting within the scope of their employment under circumstances where, if FCC was a private person, it would be liable to Alpine in accordance with the laws of the District of Columbia.

6.     This Court additionally has subject matter jurisdiction over the relief being sought by Alpine pursuant to 28 USC § 1331 to the extent that any of the relief being sought by Alpine in this matter is not subject to the Uniform Commercial Code or other applicable authority concerning the rights of parties to contract in this District.

7.      This Court has personal jurisdiction over the FCC and its agent, Pioneer, because it resides in this District and because the parties consented to the jurisdiction of this Court in the contractual documents at issue herein.

8.      Venue is proper in this district because the parties consented to this matter being brought in this District and because the events giving rise to this controversy occurred within this District.

## STATEMENT OF OPERATIVE FACTS

9.      Alpine, at all times relevant hereto, was in the business of providing wireless telecommunications services and was a participant in a 1996 FCC auction of certain PCS mobile personal communications services spectrum licenses.

10.     On or about May 6, 1996, Alpine was the winning bidder for two such licenses in the so-called FCC Auction No. 5 which awarded Alpine licenses to certain wireless spectrum in the markets of San Luis Obispo and Santa Barbara, California; those licenses are identified specifically as License No. PBB405C covering the market area BTA405 with Call Sign KNFL333 (San Luis Obispo) and License No PBB406C covering the market area BTA406 with Call Sign KNFL334 (Santa Barbara), which are referred to collectively herein as the "Licenses".

11.     At the time of its winning bids, Alpine qualified as a "small business Designated Entity" which entitled it, pursuant to the Communications Act and then-applicable FCC rules, to pay its winning bid amounts for the Licenses to FCC over time in quarterly installment payments.

12.     Effective on or about September 17, 1996, FCC assumed the role of creditor when Alpine and FCC entered into two Installment Payment Plan Notes which memorialized the

contractual relationship between Alpine as "Maker" and FCC as "Payee" concerning the financing of Alpine's winning bids (the "Notes").

13.     The Notes are attached hereto as Exhibits A (relating to the San Luis Obispo License with the face amount of $8,901,900) and B (relating to the Santa Barbara License with the face amount of $17,280,675).

14.     The Notes contained the following consent to jurisdiction of this Court, and irrevocable waiver by FCC of any objection to the jurisdiction of this Court (emphasis in original):

> ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS NOTE, THE SECURITY AGREEENT, OR OTHER DOCUMENTS EVIDENING OR SECURING THE DEBT TRANSACTION EVIDENCED HEREBY MAY ONLY BE BROUGHT IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA . . . . THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH ANY OF THEM MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN THE DISTRICT OF COLUMBIA.

15.     The Notes granted FCC the right to "assign, endorse, pledge, convey or otherwise transfer" its rights under the Notes "to any party" irrespective of, and without regard to, any of FCC's or the potential assignee of the Notes' role as an agency of the United States.

16.     Contemporaneous with the execution of the Notes, FCC assumed the role of secured creditor by securing its right to repayment of the Notes with a pledge of certain collateral of Alpine's in two Security Agreements which are attached as Exhibits C (San Luis Obispo) and D (Santa Barbara), collectively, the "Security Agreements".

17.     The Security Agreements incorporated the terms and conditions of the Notes, providing in pertinent part in Paragraph 1, "It is expressly understood [ ] that all of the terms of

4

the Note apply to this Agreement and that reference herein to 'this Agreement' includes both the Security Agreement herein and the Note."

18.     The Security Agreements went on in Paragraph 1 to incorporate the interpretations of terms as described in the Uniform Commercial Code.

19.     Paragraph 7 of the Security Agreements specified that Alpine would be in "default" of the Security Agreements if, and only if, Alpine was in "default" of its obligations as defined in the Notes.

20.     Paragraph 8 of the Security Agreements permitted FCC to exercise various contractual remedies if, and only if, Alpine was in "default" under the Notes.

21.     Without limitation, the contractual remedies available to FCC under Paragraph 8 of the Security Agreements included cancellation of the Licenses and acceleration of amounts due under the Notes.

22.     After the Licenses were issued, and in reliance on them and the covenants and representations therein, Alpine began to construct PCS networks to operate within the Licenses, investing some $90,000,000 of its own capital in the process of so doing.

23.     Over the next five years, Alpine met all of its repayment obligations to FCC under the Notes.

24.     On or about July 24, 2002, and pursuant to then-existing 31 C.F.R. § 902.2, Alpine submitted a written Request for Debt Restructuring (the "Restructuring Request") to FCC's Office of Managing Director, receipt of which was acknowledged by FCC on or about July 30, 2002.

25.     The Restructuring Request was sent pursuant to then-applicable FCC rules and the terms of the Note and was engendered by market forces beyond Alpine's control which left

Alpine with no option but to seek the relief contemplated by the Notes, the Security Agreements, and the Restructuring Request in order to avoid defaulting on the Notes.

26.     On or about July 31, 2002, and pursuant to then-existing 47 C.F.R. § 1.2110, Alpine submitted a Request for a Waiver ("Waiver Request") of the upcoming installment payment deadline due under the Notes.

27.     The Restructuring Request and the Waiver Request were each made before Alpine was in "default" under the Notes, the Security Agreements, and then-applicable FCC rules.

28.     On or about August 30, 2002, FCC contacted Alpine to begin the process of restructuring Alpine's debt obligations to FCC, as contemplated by then-existing FCC rules, the terms of the Notes and the Security Agreements, and the Restructuring Request.

29.     After months of communications between Alpine and FCC concerning the Restructuring Request and the Waiver Request, FCC unilaterally ceased negotiating in good faith and cut off discussions with Alpine.

30.     FCC thereafter failed to negotiate or process the Restructuring and Waiver Requests in good faith and pursuant to its obligations under the Notes and Security Agreements.

31.     On or about January 16, 2004, FCC notified Alpine that it was taking the position, for the first time, that Alpine was in default under the Notes and/or Security Agreements.

32.     On or about January 30, 2004, FCC advised Alpine that the Restructuring Request was being returned to Alpine "without action".

33.     After another three years' of no substantive contact from FCC concerning the Restructuring Request, on or about January 29, 2007, FCC's Wireless Telecommunications Bureau issued an Order concerning Alpine's Licenses which explicitly indicated that FCC was

not considering the Restructuring or Waiver Requests on their terms, and to date FCC has never in good faith responded to, or negotiated, the Restructuring Request.

34.     In April 2008, despite Alpine's then-pending administrative appeal, FCC noticed a new auction for the same spectrum and geographic markets as those granted by the Licenses.

35.     Over Alpine's objection, including Alpine's attempt to invoke the automatic stay attendant to its Chapter 11 bankruptcy petition, FCC conducted the re-auctioning of the spectrum and markets of Alpine's Licenses and did auction them off for a combined total of $5,548,000.

36.     On January 5, 2010, FCC issued a Memorandum Opinion and Order in an omnibus opinion (the "Omnibus Order") which incorrectly grouped Alpine's requests with those of several dissimilarly-situated third parties' waiver or restructuring requests.

37.     In the Omnibus Order, FCC admitted that it never ruled on the Restructuring or Waiver Requests at any time, and instead returned them "without action" and thereafter ignored them.

38.     Due to the timeliness of the Restructuring Request and the Waiver Request under the then-applicable FCC regulations, their pendency at the relevant times, and FCC's refusal to consider them in good faith or as contemplated by the Notes and Security Agreements, FCC's declaration that Alpine was in default of the Notes and FCC's re-auctioning of the Licenses based upon its claim that Alpine was in default were done in contravention of the express terms of the Notes, and by incorporation the Security Agreements, which provided, identically:

> *A default under this Note ("Event of Default") shall occur upon any or all of the following:*
>
> *a. Non-payment by Maker of any Principal or Interest on the due date as specified hereinabove if the Maker remains delinquent for more than 90 days and*

(1) *Maker has not submitted a request, in writing, for a grace period or extension of payments, if any such grace period or extension of payments is provided for in the then-applicable orders and regulations of the Commission; or,*

(2) *Maker has submitted a request, in writing, for a grace period or extension of payments, if any such grace period or extension of payments is provided for in the then-applicable orders and regulations of the Commission, and following the expiration of the grant of such grace period or extension or upon denial of such a request for a grace period or extension, Maker has not resumed payments of Interest and Principal in accordance with the terms of this Note…*

39.    According to Paragraph (a)(1), above, Alpine was not in default under the Notes or Security Agreements at any time during the pendency of the Restructuring Request or the Waiver Request, and according to Paragraph (a)(2), Alpine could only have been in default of the Notes after the FCC's January 5, 2010, denial of the Requests, by which time FCC had already re-auctioned Alpine's Licenses.

40.    Due to the pendency of the Restructuring and Waiver Requests, which have still never been considered on their terms by FCC, Alpine's claims as articulated in this Complaint against FCC were not ripe until, at the earliest, the January 5, 2010, Omnibus Order, and the conclusion of Alpine's appeal of that order.

41.    Following FCC's re-auctioning of Alpine's Licenses, FCC has pursued collection via Pioneer of no less than $20,947,669.39 which FCC and Pioneer claim it is due under the Notes and Security Agreements.

<u>**COUNT ONE**</u>
**(Breach of Contract by FCC)**

42.    Alpine restates the above as if set out in full herein.

43.    In declaring Alpine in "default" of the Notes, by exercising contractual remedies available to it under the Security Agreements only in the event of "default" by Alpine, by re-auctioning the spectrum of Alpine's Licenses based upon its declaration that Alpine was in

"default," by refusing to negotiate Alpine's contractual right to restructure its debts, and by refusing to negotiate the Restructuring and Waiver Requests in good faith, FCC breached its contractual obligations, including those  embodied in the Licenses, the Notes, and the Security Agreements, as well as its duties of good faith and fair dealing.

44.     Due to FCC's breach, Alpine was damaged in the amount of its expectancy or, in the alternative, its reliance, on the contractual obligations of the Licenses, the Notes, and the Security Agreements.

45.     Alpine's damages arising out of FCC's breach are in excess of the $20,947,669.39 FCC now claims it is owed by Alpine, in a specific amount to be determined at trial.

## COUNT TWO
### (Unjust Enrichment)

46.     Alpine restates the above as if set out fully herein.

47.     The FCC was unjustly enriched in the amount of every Note payment made by Alpine and any amounts which FCC obtained from the re-auctioning of the Licenses due to FCC's inequitable conduct.

48.     Alpine should be awarded equitable relief, including disgorgement by FCC of the amount that it was unjustly enriched by its inequitable conduct.

## COUNT THREE
### (Fraud in the Inducement)

49.     Alpine restates the above as if set out fully herein.

50.     FCC represented to Alpine in the Notes and Security Agreements that FCC explicitly waived any objection to the jurisdiction of this Court to hear any disputes between Alpine and FCC concerning the Notes and Security Agreements and that this Court was the sole

and exclusive court within which either party may bring an action under the Notes and Security Agreements.

51.     Alpine reasonably relied on those representations.

52.     If FCC's waiver of its objections to the jurisdiction of this Court are not effective, or it FCC takes the position that it is immune or otherwise not subject to this suit in this Court, then FCC's representations were false, or were made with reckless disregard for their truth or falsity, and Alpine's reliance on those representations was detrimental to it.

53.     Alpine's detrimental reliance on FCC's representations about its waiver of objections to the jurisdiction of this Court have damaged Alpine in the amount of damages that it seeks against FCC for its breach of contract and for FCC's unjust enrichment.

54.     Due to FCC's fraudulent inducement, the Notes are voidable and this Court should void them and enter an award in Alpine's favor returning of any consideration Alpine offered for the Notes, the Licenses, or the Security Agreements.

### COUNT FOUR
**(Declaratory Judgment – No Default by Alpine)**

55.     Alpine restates the above as if set out fully herein.

56.     There is an actual controversy under the Notes and the applicable regulations and controlling law concerning whether Alpine was in default under the Notes and, if so, at what time it was in default.

57.     Alpine requests a declaratory judgment by this Court that it was not in default under the Notes at any time prior to FCC's re-auctioning of Alpine's License spectrum or, in the alternative, at any time before FCC revoked those Licenses.

## COUNT FOUR
### (Declaratory Judgment – No Debt to FCC or Pioneer)

58.     Alpine restates the above as if set out fully herein.

59.     There is an actual controversy under the Notes, Security Agreements, and the applicable regulations and controlling law concerning whether Alpine is indebted to FCC or Pioneer for any amount.

60.     Alpine requests a declaratory judgment by this Court that it is not indebted to FCC or Pioneer for any amount under the Notes or Security Agreements.

## COUNT FIVE
### (Breach of Fiduciary Duty)

61.     Alpine restates the above as if set out fully herein.

62.     As the body issuing the Licenses for the benefit of the public and as a consequence of FCC's position as a "super-creditor" to Alpine, FCC's contractual dealings with Alpine, as licensee, created a special relationship of trust and confidence between FCC and Alpine.

63.     FCC's duties to Alpine included fiduciary obligations of trust and confidence.

64.     FCC's refusal to timely, or even properly, consider the Restructuring and Waiver Requests breached its fiduciary duties to Alpine.

65.     As a result of FCC's breach of its fiduciary duties, Alpine was damaged in an amount to be determined at trial, including its attorney fees and punitive damages due to FCC's willful and wanton negligence.

WHEREFORE, Plaintiff Alpine PCS, Inc., requests this Court to enter judgment in its favor on all counts, to award it damages in an amount to be determined at trial, to award it declaratory relief to the effect that Alpine was never in default under the Notes before January 5, 2010, to award it declaratory relief to the effect that Alpine is not indebted to FCC or Pioneer for any amount, to award it costs and attorney fees, to award it punitive damages, and to award it any other relief to which it is entitled.

Respectfully submitted,

**Buckman Legal, PLLC**

Steven M. Buckman (DC Bar No. 321133)
buckman@buckmanlegal.com

4315 50th Street NW Suite 60
Washington, District of Columbia  20016

Telephone:  (202) 351-6100
Facsimile:   (888) 624-7640

Of Counsel

**Ross M. Babbitt Co., LPA**

Ross M. Babbitt (Ohio Atty. Reg. No. 0072946)
rbabbitt@babbitt-lawfirm.com

700 West St. Clair Avenue
Hoyt Block, Suite 200
Cleveland, OH 44113

Telephone: (216) 623-6346
Facsimile: (216) 274-9683

Attorneys for Alpine PCS, Inc.